# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**QWEST CORPORATION**,
a Colorado corporation,

       Plaintiff,

    vs.                                  No.    **CIV 00-795 MCA/DJS**

**CITY OF SANTA FE,**
**NEW MEXICO**,

       Defendant.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Qwest Corporation's Motion

for Summary Judgment [Doc. No. 20] filed on October 31, 2000, and the parties' stipulation

at the status conference in this matter on July 24, 2002, that all of Qwest's claims can be

decided by the Court based upon undisputed material facts without a trial. Having

considered the pleadings of record, the briefs and exhibits attached thereto, the relevant law,

and otherwise being fully advised in the premises, the Court finds that Qwest is entitled to

partial summary judgment declaring that Sections 27-2.3(E), 27-3.2, 27-3.3, 27-3.4, 27-3.5,

27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of Defendant City of Santa Fe's

1998 telecommunications ordinance, when viewed as a whole, are preempted by federal law.

The Court determines that the City should be enjoined from enforcing these provisions of the

1998 ordinance against Qwest.  The Court further determines that the City of Santa Fe is entitled to partial summary judgment as to the remainder of Qwest's claims.  Accordingly, Qwest's Motion for Summary Judgment is granted in part and denied in part, and the Court grants partial summary judgment to the City of Santa Fe *sua sponte* based upon the parties' stipulations at the status conference.

## I.      BACKGROUND

The facts alleged in Qwest's summary-judgment motion are undisputed except as specifically noted below.  Qwest is a telecommunications carrier authorized under federal and state law to provide telephone exchange service throughout the State of New Mexico, including the City of Santa Fe.  Under Qwest's tariff with New Mexico's Public Regulation Commission (PRC), Qwest is obligated to provide service to all customers requesting service within the geographical area it serves and may not terminate or withdraw service without an order from the PRC.  Qwest seeks to serve new customers as well as to upgrade its existing services and add new telecommunications services in the City of Santa Fe.

In 1975, Qwest's predecessor and the City of Santa Fe entered into a franchise agreement under which Qwest has paid a franchise fee of two percent (2%) of its gross receipts from local exchange service in consideration for the right to use any of the City's public rights-of-way for purposes of providing telecommunications services to residents of the City of Santa Fe.  The franchise agreement also imposed certain obligations on Qwest regarding management of the City's rights-of-way, including a requirement that a right-of-way disturbed by Qwest be returned to its prior condition within ninety (90) days, a

permitting requirement for street cuts, a requirement that Qwest perform a survey to ensure that any trenching would not damage existing cables or pipes, and provisions for traffic-control planning when Qwest's work on the rights-of-way closed a street or reduced it to a single lane. <u>See</u> Santa Fe, N.M., Ordinance No. 1975-8 (1975). (Ex. 3-A to Mem. in Supp. of Qwest's Mot. for Summ. J.)

Under this franchise agreement, Qwest used the City's rights-of-way to construct a network of telephone lines, switches, offices, transport, and related facilities to provide telecommunications services to residents of the City of Santa Fe. Qwest needs to continue to use the City's rights-of-way to maintain, upgrade, and expand these facilities in order to maintain service to existing customers, serve new customers, and provide new services.

In 1996, Congress enacted legislation to deregulate and encourage competition in the telecommunications market. Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253 (West Supp. 2001), provides, in relevant part, that:

**(a)   In general**

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

**(b)   State regulatory authority**

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with [S]ection 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

**(c)     State and local government authority**

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

**(d)     Preemption**

If, after notice and an opportunity for public comment, the [Federal Communications] Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

On or about March 25, 1998, the City of Santa Fe enacted a telecommunications ordinance which established several new rules governing the use of its rights-of-way by owners of telecommunication facilities.  See Santa Fe, N.M., Ordinance No. 1998-16 (1998) (codified in Chapters 14 and 27 SFCC 1987).  Among these new rules are a requirement that telecommunications owners must register with the City and apply for a lease if they desire to install new telecommunications facilities, or maintain existing ones within the City's rights-of-way.  See §§ 27-2 and 27-3 SFCC 1987.

The ordinance also provides for the City to charge cost-based registration fees and application fees.  See id. §§ 27-2.4 and 27-5.2.  The exact amount of such fees, however, has not yet been determined by the City.  As part of the application process, the ordinance further requires a lease applicant to provide certain information to the City, including an appraisal of the "fair market rental value" of the right-of-way issued by a third-party appraiser

approved by the City.  See id. § 27-3.3.  The parties disagree about the extent to which the requested information is relevant to the usage of the City's rights-of-way.

The ordinance requires the City to hold a hearing on a lease application within sixty (60) days, but permits the City to exercise its discretion in granting or denying a lease.  See id. § 27-3.4.  If a lease is granted, the ordinance requires, among other things, that the lessee pay an appraisal-based rental fee for its use of the City's right-of-way and dedicate all conduit laid upon the City's property to the City.  See id. § 27-3.7(F) and 27-5.3.  If a lessee installs new conduit, the ordinance requires the lessee to install double the amount of capacity needed for the applicant's own use.  See id. § 27-3.7(G).  The parties disagree about whether these requirements are competitively neutral.  They also disagree about some aspects of the methodology used to calculate the rental fee.

In late 1999 or early 2000, Qwest sought permission from the City to install a four-foot by four-foot "cabinet" sitting on a twelve-by-eighteen foot concrete pad within a portion of the City's right-of-way on Bishop's Lodge Road for the purpose of providing telecommunications services to new customers.  The City refused to permit Qwest to install this cabinet until Qwest agreed, without any reservation of its rights under state or federal law, to enter into a lease which could be terminated for cause and/or upon sixty (60) days written notice.

In attempting to comply with the City's ordinance, Qwest performed two professional surveys of the property in question at $2,000 per survey and incurred the labor costs of $6,650 for 53.2 hours of work (calculated at $125 per hour) on the part of a field engineer,

right-of-way agent, and design engineer. These costs were in addition to the costs of placing the facility in the right-of-way under the 1975 franchise agreement. Qwest estimates the typical cost of obtaining an appraisal for property of comparable size to the Bishop's Lodge Road property at $750 and notes that the annual rent charged by the City for this property is $6,000. (Decl. of Alan Varela; Decl. of Daniel T. Sanchez.)

Within the City of Santa Fe, Qwest has more than 365 large cabinets comparable to the one at the Bishop's Lodge Road location, thousands of smaller cabinets and pedestals, hundreds of manholes and vaults, and hundreds of miles of cable. In addition, Qwest has approximately 120 planned or ongoing projects in Santa Fe that involve installation of new facilities which involve use of the City's rights-of-way. For projects that involve installation of new conduit, Qwest estimates a 59% increase in cost in order to meet the requirement of 100% excess-capacity conduit (Decl. of Daniel T. Sanchez) while the City estimates a cost increase of between 30% and 50% for such work (Aff. of Leroy N. Pacheco). Qwest also contends that there is no guarantee that the company will be reimbursed for the cost of installing this extra conduit under Section 27-3.7(G) because there is no guarantee that other carriers will ever use it. (Mem. in Supp. of Mot. for Summ. J. at 19; Decl. of Dr. William L. Fitzsimmons.)

The City has advised Qwest that, under the ordinance, Qwest would have to enter into a similar lease or leases and incur similar obligations for all uses of any other rights-of-way in the City of Santa Fe. Qwest has refused to make an application for any such leases.

The franchise agreement between the City and Qwest's predecessor expired in April 2000. The City's revenue from that franchise for the fiscal year 1999-2000 was $576,166.

On June 1, 2000, Qwest filed a civil action against the City of Santa Fe to challenge the City's telecommunications ordinance. The parties have agreed that Qwest may continue to operate under the terms of the 1975 franchise agreement while the litigation is pending. At a status conference held in this matter on July 23, 2002, the parties stipulated that all of Qwest's claims can be decided by the Court based upon undisputed material facts, without a trial.

## II.  **ANALYSIS**

Qwest claims that the City of Santa Fe's telecommunications ordinance violates Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253, and is preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, and certain provisions of state law, see N.M. Const. art. XI, § 2; N.M. Stat. Ann. ch. 63, art. 9A (Michie 1978 & Supp. 2001). Qwest further claims that the alleged violation of Section 253 of the Telecommunications Act is enforceable under 42 U.S.C. § 1983 (1994). Qwest seeks declaratory and injunctive relief regarding the above claims, as well as an award of attorney fees under 42 U.S.C. § 1988 (1994).

Based upon the undisputed material facts, the Court concludes that Qwest has a viable federal preemption claim under the Supremacy Clause of the United States Constitution, but that there is no private right of action available to Qwest under Section 253 of the Telecommunications Act or 42 U.S.C. § 1983 in this case. The Court further concludes that

certain provisions of the City's ordinance are preempted by Section 253 of the Telecommunications Act, but that those provisions are severable from the remainder of the ordinance. None of the remaining provisions of the ordinance are preempted by state law. It follows that Qwest is entitled to partial summary judgment declaring that certain provisions of the City's ordinance are preempted by federal law and enjoining the City from enforcing those provisions against Qwest, but the City of Santa Fe is entitled to summary judgment as to the remainder of Qwest's claims. Qwest is not entitled to an award of attorney fees or any affirmative injunctive relief forcing the City to issue permits, franchises, or leases or remit fees to Qwest.

A.    **Standard of Review**

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted to the Court show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). A fact is "material" if it might affect the outcome of the case. See id. at 248.

In ruling on a motion for summary judgment, the Court must consider the nonmovant's burden of persuasion at trial. See id. at 254. While a defendant may show that summary judgment in its favor is appropriate by pointing out a plaintiff's failure to make an adequate showing on an essential element of its case as to which the plaintiff has the burden

of proof at trial, a plaintiff moving for summary judgment cannot rely solely on the absence of evidence favoring the defendant but must also establish that, based on the pretrial record, no reasonable factfinder at trial could fail to regard the plaintiff as having discharged its burden of proof as to each element of its claims. See 11 James Wm. Moore, <u>Moore's Federal Practice</u> §56.03[4] (3d ed. 2002).

In considering the burden of proof in the context of ruling on a motion for summary judgment, however, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings. Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 551-52 (1999).

In the present case, the task of applying Fed. R. Civ. P. 56 is simplified because the material facts are undisputed and the parties have stipulated that the entire matter can be decided without a trial. These stipulations make this case one of the rare instances in which a partial summary judgment as to some of the claims may be entered *sua sponte*. <u>See</u> <u>Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.</u>, 131 F.3d 874, 892 (10th Cir. 1997); <u>David v. City & County of Denver</u>, 101 F.3d 1344, 1358-59 (10th Cir. 1996). The central question is whether either party is entitled to judgment as a matter of law as to each of Qwest's claims based on the undisputed material facts.

**B.**     **Subject-Matter Jurisdiction**

A plaintiff bears the ultimate burden of proving that the Court has subject-matter jurisdiction. See Aragon v. United States, 146 F.3d 819, 823 (10th Cir. 1998). Thus, Qwest must establish that this Court has subject-matter jurisdiction in order to show that it is entitled to summary judgment. See Anderson, 477 U.S. at 254.

Qwest's complaint alleges that this Court's subject-matter jurisdiction over this action is based on 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy); 28 U.S.C. § 1337 (commerce and antitrust regulations); and 28 U.S.C. § 1343 (civil rights and elective franchise). The City's answer denies these jurisdictional allegations, including the allegation that the parties are diverse. The parties do not directly address their dispute over these jurisdictional allegations in their briefs regarding Qwest's summary-judgment motion. Even if there exists an open question as to whether Qwest has a viable federal claim in this action, however, this Court has subject-matter jurisdiction because Qwest's federal claims are not so completely devoid of merit as to not involve a federal controversy. See Owasso Indep. Sch. Dist. No. I-011 v. Falvo, 122 S. Ct. 934, 938 (2002); cf. Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 365 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional.").

**C.**     **Viability of Qwest's Federal Claims**

Notwithstanding the conclusion that this Court has subject-matter jurisdiction over this matter, it is still necessary to determine which, if any, federal law or constitutional

provision Qwest's claims "arise under" for purposes of 28 U.S.C. §§ 1331, 1337, or 1343, before the Court can determine whether either party is entitled to judgment as a matter of law on Qwest's federal claims.  See generally Merrell Dow Pharmaceuticals Inc. v. Thompson, 478 U.S. 804, 817 (1986) ("[W]hen Congress has determined that there should be no private, federal cause of action . . . [a claimed] violation[] does not state a claim arising under the Constitution, laws, or treaties of the United States.").  (Internal quotations omitted.)  Qwest's complaint alleges that its federal claims arise under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2; Section 253 of the Telecommunications Act, 47 U.S.C. § 253; and 42 U.S.C. § 1983.  The Court  concludes, however, that neither 42 U.S.C. § 1983 nor Section 253 of the Telecommunications Act provide Qwest with a private cause of action upon which a summary judgment in Qwest's favor could be based.  Qwest's only viable federal claim arises under the Supremacy Clause.

## 1.     The Supremacy Clause

A claim that a local ordinance is preempted by the Telecommunications Act pursuant to the Supremacy Clause of the United States Constitution is distinct from a claim for enforcement of that federal statute by means of an implied private right of action or Section 1983.  See Cablevision of Boston, Inc. v. Pub. Improvement Comm'n, 38 F. Supp. 2d 46, 57 (D. Mass. 1999), aff'd on other grounds, 184 F.3d 88 (1st Cir. 1999); AT & T Communications of the Southwest, Inc. v. City of Austin, Tex., 975 F. Supp. 928, 937 (W.D. Tex. 1997), vacated as moot, 235 F.3d 241 (5th Cir. 2000 ).  "[P]rivate plaintiffs seeking injunctive or declaratory relief may challenge a . . . local ordinance pursuant to the

Supremacy Clause, regardless whether a federal statute confers a private right of action on the plaintiffs." Qwest Communications Corp. v. City of Berkeley, 146 F. Supp. 2d 1081, 1090 (N.D. Cal. 2001) [hereinafter "City of Berkeley I"]. "A claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied right of action [or an action pursuant to Section 1983] is a means of enforcing the substantive provisions of a federal law." Western Air Lines v. Port Auth. of N.Y. & N.J., 817 F.2d 222, 225 (2d Cir. 1987); see also Howard v. Burlingame, 937 F.2d 1376, 1380 (9th Cir. 1991) ("[T]he [S]upremacy [C]lause merely safeguards federal interests against state infringement, and operates to preempt state regulatory action without creating individual rights.").

Courts have consistently recognized or assumed that private parties may bring claims under the Supremacy Clause asserting that Section 253 of the Telecommunications Act preempts the conflicting provisions of a local ordinance. See Cablevision of Boston, Inc., 38 F. Supp. 2d at 57; City of Austin, 975 F. Supp. at 937; City of Auburn v. Qwest Corp., 260 F.3d 1160, 1175 (9th Cir. 2001); City of Berkeley I, 146 F. Supp. 2d at 1090; Bd. of County Comm'rs of Grant County v. Qwest Corp., 169 F. Supp. 2d 1243, 1246 (D.N.M. 2001); Bellsouth Telecommunications, Inc. v. City of Mobile, 171 F. Supp. 2d 1261, 1266 (S.D. Ala. 2001). The Court concludes that Qwest may seek preemption under the Supremacy Clause in this case as well.

### 2.       Implied Private Right of Action

There is a lack of consensus among the courts as to whether or to what extent Congress intended Section 253 of the Telecommunications Act to create a private right of action or a federal right that can be enforced by means of Section 1983 in this context. Although the four factors enumerated in Cort v. Ash, 422 U.S. 66, 78 (1975) are still relevant to deciding whether a federal statute creates an implied private right of action, the determinative factor is congressional intent, see Gonzaga Univ. v. Doe, 122 S. Ct. 2268, 2275-77 (2002); Touche Ross & Co. v. Redington, 442 U.S. 560, 575 (1979).

Relying heavily on the remarks of one Senator during a floor debate, some have reasoned that Congress must have intended Section 253 to create a private right of action as a means to preempt conflicting local regulation in the area of management and compensation for the use of public rights-of-way because the Federal Communications Commission (FCC) was not expressly granted the authority to preempt such local regulation under Section 253(d).  See Bellsouth Telecommunications, Inc. v. Town of Palm Beach, 252 F.3d 1169, 1189-91 (11th Cir. 2001) (citing 141 Cong. Rec. S8306, 8308 (daily ed. June 14, 1995) (remarks of Senator Gorton)); TCG Detroit v. City of Dearborn, 206 F.3d 618, 623-24 (6th Cir. 2000) (2-1 decision citing 141 Cong. Rec. S8213 (June 13, 1995) (remarks of Senator Gorton)).  Others have reached the opposite conclusion on the grounds that isolated floor remarks are not reliable evidence of congressional intent and that such a private right of action is contrary to the plain meaning and the structure of Section 253.  See Qwest Communications Corp. v. City of Berkeley, 202 F. Supp. 2d 1085, 1095-96 (N.D. Cal. 2001)

[hereinafter City of Berkeley II]; Cablevision of Boston, Inc., 38 F. Supp. 2d at 56-57; Cablevision of Boston, Inc., 184 F.3d at 107-08 (Noonan, J., concurring in the result); TCG Detroit, 206 F.3d at 626 (Guy, J., concurring in part and dissenting in part); GST Tucson Lightwave, Inc. v. City of Tucson, 950 F. Supp. 968, 970-71 (D. Ariz. 1996).

The arguments against recognizing an implied private right of action under Section 253 are more persuasive. The Telecommunications Act of 1996 took the form of an amendment to the Telecommunications Act of 1934. Both earlier versions of the statute and the 1996 amendments contain various private rights of action and administrative remedies that Congress expressly created. These provisions show that Congress knew how to create private rights of action when it intended to do so. See Cablevision of Boston, Inc., 38 F. Supp. 2d at 57. Further, the floor remarks of Senator Gorton do not necessarily give rise to an inference that Congress intended Section 253 to create an implied private of action. They are equally consistent with a recognition of the authorities existing at the time of the congressional debate that allowed a private party to pursue a civil action in federal district court to preempt conflicting state and local regulations under the Supremacy Clause without the need for an implied right of action under a federal statute. See City of Berkeley II, 202 F. Supp. 2d at 1096. For these reasons, the Court concludes that Section 253 does not create a private right of action of which Qwest may avail itself in this case.

### 3. Section 1983

The Court also concludes that Qwest does not state a viable claim under Section 1983 in this case. To support its argument that a Section 1983 claim is viable in this

context, Qwest cites the Eleventh Circuit's opinion in <u>AT&T Wireless PCS, Inc. v. City of Atlanta</u>, 210 F.3d 1322 (11th Cir. 2000).  That opinion, however, was vacated pending rehearing *en banc*, <u>see</u> <u>AT&T Wireless PCS Inc. v. City of Atlanta</u>, 260 F.3d 1320 (11th Cir. 2001), and the parties later stipulated to dismissal of the appeal, <u>see AT&T Wireless PCS, Inc. v. City of Atlanta</u>, 264 F.3d 1314 (11th Cir. 2001).  Further, the Supreme Court's recent opinion in <u>Gonzaga Univ.</u>, 122 S. Ct. at 2275-77, as well as authorities from other circuits, weigh persuasively against the use of Section 1983 to enforce the Telecommunications Act or its predecessor statute, the Communications Act of 1934, <u>see</u> <u>Cablevision of Boston, Inc.</u>, 38 F. Supp. 2d at 54-56; <u>Nextel Partners Inc. v. Kingston Township</u>, 286 F.3d 687, 693-96 (3rd Cir. 2002); <u>Nat'l Telecomm. Advisors, Inc. v. City of Chicopee</u>, 16 F. Supp. 2d 117, 121-23 (D. Mass. 1998); <u>Sprint Spectrum, L.P. v. Town of Ogunquit</u>, 175 F. Supp. 2d 77, 93-94 (D. Me. 2001); <u>Forbes v. Ark. Educ. Television Communication Network Found.</u>, 22 F.3d 1423, 1428 (8th Cir. 1994) (en banc); <u>DeYoung v. Patten</u>, 898 F.2d 628, 634 (8th Cir. 1990), <u>overruled on other grounds by</u> <u>Forbes</u>, 22 F.3d at 1428; <u>Howard</u>, 937 F.2d at 1378-81.

"In order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."  <u>Blessing v. Freestone</u>, 520 U.S. 329, 340 (1997).  "Accordingly, it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section."  <u>Gonzaga Univ.</u>, 122 S. Ct. at 2275.

The Supremacy Clause of the United States Constitution cannot form the basis for a Section 1983 claim because the Supremacy Clause "does not secure and is not itself a right, privilege or immunity secured by the Constitution."  <u>Cablevision of Boston, Inc.</u>, 38 F. Supp.

2d at 54 (citing Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 613 (1979)). "This is because the [S]upremacy [C]lause merely safeguards federal interests against state infringement, and operates to preempt state regulatory action without creating individual rights." Howard, 937 F.2d at 1380 (citing Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 (1989)).

Like the Supremacy Clause, Section 253 of the Telecommunications Act simply operates to preempt certain state or local regulatory actions without creating individual rights. The plain language of the statute and the relevant portions of the congressional committee reports use the word "preemption" to describe the remedy available under Section 253 and do not mention or suggest any other remedy. See 47 U.S.C. § 253(d) ("[T]he Commission shall preempt the enforcement of such [state or local] statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency."); H.R. Conf. Rep. No. 104-458, at 126-27 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 138-39 (explaining the relevant section of the Senate bill); H.R. Rep. No. 104-204, at 75 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 41 (explaining the relevant section of the House bill); cf. City of Chicopee, 16 F. Supp. 2d at 122 ("[I]t is manifest that Congress provided precisely the remedies it considered appropriate when drafting the TCA.").

The legislative history also indicates that Section 253 was enacted as part of a series of amendments to the Communications Act of 1934. As originally enacted, "'[t]he Communications Act of 1934 did not create new private rights.'" Howard, 937 F.2d at 1379 (quoting Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14 (1942)). Thus, if Congress had

-16-

intended Section 253 to create new private rights that could be enforced under Section 1983, one would have expected this change to be noted more clearly.

The evidence of congressional intent further indicates that Congress specifically foreclosed a remedy under § 1983 in this context by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." <u>Blessing</u>, 520 U.S. at 341; <u>see</u> <u>Cablevision of Boston, Inc.</u>, 38 F. Supp. 2d at 55-56. "A key distinction between schemes that are sufficiently comprehensive to preclude a § 1983 claim and those that are not is the availability of private judicial remedies under the statute giving rise to the claim." <u>Kingston Township</u>, 286 F.3d at 694; <u>accord</u> <u>City of Chicopee</u>, 16 F. Supp. 2d at 121-22. As noted above, Congress included language in Section 253 that expressly preempts state and local law which conflict with its mandates, thus making a well-established private judicial remedy available in conjunction with the Supremacy Clause. See <u>Cablevision of Boston, Inc.</u>, 38 F. Supp. 2d at 57-58. In addition, Congress expressly created an administrative remedy under which private parties may petition the FCC to preempt the enforcement of state or local statutes, regulations, or legal requirements that violate Section 253(a) or (b) "to the extent necessary to correct such violation or inconsistency." 47 U.S.C. § 253(d). Section 257 of the Telecommunications Act also provides for FCC proceedings and periodic reviews "for the purpose of identifying and eliminating by regulations pursuant to its authority under this chapter . . . market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services. . . ." 47 U.S.C. § 257(a).

The scope of the preemptive language of Section 253 and the administrative remedies provided in the statute both reflect a carefully crafted balance between deregulating the telecommunications market at the federal level and preserving state and local authority to regulate in certain prescribed areas. For example, the legislative history suggests that the provision of the Senate bill which later became Section 253 was amended to limit the scope of local regulatory actions that can be preempted in administrative proceedings before the FCC based on concerns about the costs that would be imposed on local governments if they were required to travel frequently to Washington, D.C. to defend their actions before the FCC. See 141 Cong. Rec. S8170 (daily ed. June 12, 1995) (remarks of Sen. Feinstein); 141 Cong. Rec. S8306, S8308 (daily ed. June 14, 1995) (remarks of Sen. Gorton). Requiring local governments to pay their opponent's attorney fees pursuant to Section 1983 and 42 U.S.C. § 1988 whenever a court determines that local laws are preempted by Section 253 would upset this delicate balance and "increase the federal burden on local land-use regulation beyond what Congress intended." Kingston Township, 286 F.3d at 695; cf. City of Atlanta, 210 F.3d at 1330 (Carnes, J., concurring specially) (noting potential for imbalance between large multi-national telecommunications carriers and their affiliates that typically appear as plaintiffs in Section 253 litigation and small municipalities that typically appear as defendants in such litigation). For these reasons, the Court concludes that Qwest has not stated a viable claim under 42 U.S.C. § 1983.

## C.    **Merits of Qwest's Preemption Claims**

Having concluded that Qwest's only viable federal claim arises under the Supremacy Clause of the United States Constitution, the analysis turns to the question whether the City's telecommunications ordinance is preempted in whole or in part by Section 253 of the Telecommunications Act.   "'[P]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state [or local] law. . . .'" RT Communications, Inc. v. FCC, 201 F.3d 1264, 1269 (10th Cir. 2000) (quoting Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368 (1986)).   Section 253 is a clear example of such an expression of congressional intent.   See id.

In order for a local regulation to be preempted by Section 253, two sets of requirements must be met.   The first set of requirements is stated in Section 253(a).   The second set of requirements is stated in Section 253(c).   The requirements of Section 253(a) must be analyzed first before the requirements of Section 253(c) are considered.   See Town of Palm Beach, 252 F.3d at 1191-92; Qwest Communications Corp. v. City of Berkeley, 208 F.R.D. 288, 293 (N.D. Cal. 2002) [hereinafter City of Berkeley III]; Qwest Corp. v. City of Portland, 200 F. Supp. 2d 1250, 1255-56 (D. Or. 2002).

Under Section 253(a), local regulations are subject to preemption if they "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."   47 U.S.C. § 253(a); see City of Portland, 200 F. Supp. 2d at 1255.   A regulation can have the effect of prohibiting an entity's ability to provide a

telecommunications service even if the barrier it imposes is not complete or insurmountable. See RT Communications, Inc., 201 F.3d at 1269.

Local regulations have been held to have such prohibitory effects when they are shown to grant the government (or an incumbent telecommunications provider) "essentially unfettered discretion" to determine whether the local regulatory scheme will operate to preclude any entity from providing telecommunications services in its territory. Id.; see City of Auburn, 260 F.3d at 1176, 1179; TCG New York, Inc. v. City of White Plains, N.Y., 125 F. Supp. 2d 81, 88-89, 93 (S.D.N.Y. 2000). In such cases, there is a well-founded concern that local governments might use their authority to manage public rights-of-way as a pretext for micromanaging a telecommunications company's operations in a wider context. See City of Auburn, 260 F.3d at 1178; TCG New York, Inc., 125 F. Supp. 2d at 94. Inasmuch as the presence of such "unfettered discretion" can be determined as a matter of law from the language of the local regulation itself, an extensive factual record is not necessarily required to support such a determination. See, e.g., City of Auburn, 260 F.3d at 1175-76.

On the other hand, "the parameters of what is considered prohibitory under § 253(a) are not likely to be so broad as to preempt any and all local action." TCG New York, Inc., 125 F. Supp. 2d at 88. "Section 253(a) speaks in terms of a prohibition, not in terms of minor delays[,] . . . increased costs[,] and occasional inconvenience." City of Mobile, 171 F. Supp. 2d at 1281-82. Thus, some aspects of a local regulation, such as the fees or informational requirements associated with the application process, may require careful

analysis of the factual record in order to determine whether they have a prohibitory effect. See City of Berkeley III, 208 F.R.D. at 294-95.

Principles of federalism and home rule also counsel against using the authority of the federal courts to micromanage the operations of a local government by issuing broad, conclusory opinions about the effect of local regulations without carefully examining the proffered reasons for the local government's actions or affording any deference to the expertise of local officials in managing their own affairs. Cf. Printz v. United States, 521 U.S. 898, 928 (1997) ("It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority."); N.M. Const. art. X, § 6(E) ("The purpose of this section is to provide for maximum self-government. A liberal construction shall be given to the powers of municipalities."). Such principles find further application in Section 253(c) of the statute.

Under Section 253(c), a local regulation with a prohibitory effect is saved from preemption if it falls within the scope of the local government's "authority . . . to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis," where "the compensation required is publicly disclosed by such government." 47 U.S.C. § 253(c). In other words, a local regulation that falls within a local government's authority to manage the public rights-of-way or to require telecommunications providers to pay fair and reasonable compensation for their use of public rights-of-way under the conditions specified in Section 253(c) is not preempted

by Section 253(a) even if the regulation at issue may have the effect of prohibiting an entity's ability to provide a telecommunications service.  Examples of local regulation that generally are not preempted under Section 253 include "'coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.'"  TCG New York, Inc., 125 F. Supp. 2d at 90 (quoting In re TCI Cablevision, 1997 WL 580831, 12 F.C.C.R. 21,396, at ¶ 103 (F.C.C. 1997)).

In the context of litigation, Section 253(c) is often treated as a savings clause that a local government may raise as an affirmative defense in the event that an opposing party is successful in showing that the local government's regulation has a prohibitory effect on the ability of any entity to provide telecommunications services.  See, e.g., City of Berkeley II, 202 F. Supp. 2d at 1093; TCG New York, Inc., 125 F. Supp. 2d at 89 n.5.  The fact that the local government ultimately bears the burden of proof at trial as to this affirmative defense must be taken into account in analyzing a motion for summary judgment.  See Anderson, 477 U.S. at 254.

In addition to carving out an affirmative defense to the broad preemptive language of Section 253(a), the language in Section 253(c) has been construed to impose "'a negative restriction on local authorities' choices regarding the management of their rights of way.'"  RT Communications, Inc., 201 F.3d at 1269 (quoting Cablevision of Boston, Inc., 184 F.3d at 105).  That is, in the event that a local government chooses to impose regulations to

manage and require compensation for the use of its rights of way, Section 253(c) would require that it do so in a way that is fair, reasonable, nondiscriminatory, and "'competitively neutral.'"  See id.

Courts have been careful to note, however, that these requirements of Section 253(c) do not "impose on local governments on affirmative obligation to enact regulations," Cablevision of Boston, Inc., 184 F.3d at 104, because the imposition of such an affirmative obligation "would raise significant constitutional issues regarding Congress's ability to commandeer local regulatory bodies for federal purposes," id. at 105 (citing Printz, 521 U.S. at 934).  Thus, while Section 253 imposes a negative restriction on local governments' power to regulate, one must look elsewhere for the source of a local government's authority to enact regulations for the purpose of managing and requiring compensation for the use of public rights-of-way.

The source of such authority typically is found in state or local law.  For that reason, determining whether Section 253(c) can save a particular local regulation from federal preemption depends to some degree on what authority is granted to that local government under the laws of the state where it is located.  In this case, Qwest claims that the City of Santa Fe lacks such authority because, in addition to alleging preemption under federal law, Qwest alleges that the City's ordinance is preempted by state law.

In particular, Qwest asserts in its summary-judgment motion that the following provisions of the City's 1998 telecommunications ordinance are preempted by federal and state law:  (1) the registration requirements in Sections 27-2.1, 27-2.3, and 27-2.4; (2) the

lease application and renewal requirements in Sections 27-3.2, 27-3.3, 27-3.4, and 27-3.5;

(3) the requirements for dedication of conduit and installation of excess-capacity conduit in

Section 27-3.7; and (4) the fee structure set forth in Sections 27-5.2 and 27-5.3. (Mem. in

Supp. of Qwest's Mot. for Summ. J. at 4 n.3.) According to Qwest, these provisions of the

City's telecommunications ordinance have a prohibitory effect on its ability to provide

telecommunications services in the City of Santa Fe because they "significantly burden the

provision of telecommunications services to Santa Fe residents." (Id. at 3, 10.) Qwest

further asserts that the provisions of the ordinance listed above impose requirements that do

not fall within the City's authority to manage public rights-of-way or to require fair and

reasonable compensation for the use of such rights-of-way on a nondiscriminatory and

competitively neutral basis.

Finally, Qwest alleges that the provisions of the ordinance at issue here are not

severable from the remainder of the City's telecommunications ordinance. For that reason,

Qwest claims that the ordinance must be preempted in its entirety.

The Court agrees that some of the provisions of the City's ordinance have a

prohibitory effect on Qwest's ability to provide telecommunications services in the City of

Santa Fe. The Court also agrees that some of these provisions are not saved from preemption

by Section 253(c) because they exceed the City's authority to manage or require fair and

reasonable compensation for the use of public rights-of-way on a nondiscriminatory and

competitively neutral basis. The Court does not agree, however, that all of the provisions

of the ordinance which Qwest challenges are preempted or that the ordinance as a whole must be preempted for lack of severability.

To distinguish those provisions of the City's telecommunications ordinance which Qwest has shown to be preempted from those for which Qwest has not made such a showing, it is necessary to first analyze the source of the City's authority to manage and require compensation for the use of its rights-of-way under state law. The Court then analyzes whether the challenged provisions of the ordinance fall within the scope of that authority, whether they have a prohibitory effect on the provision of telecommunications services, and whether the provisions which have a prohibitory effect are saved from preemption by Section 253(c). Finally, the Court addresses the cumulative effect of the challenged provisions of the ordinance and their severability.

## 1. City's Authority Under State Law

Qwest contends that the City's authority to regulate the provision of telecommunications services is preempted or otherwise limited by Article XI, Section 2 of the New Mexico Constitution and the New Mexico Telecommunications Act (NMTA). N.M. Stat. Ann. ch. 63, art. 9A (Michie 1978 & Supp. 2001) (to be repealed effective July 1, 2003). Article XI, Section 2 of the New Mexico Constitution assigns to the PRC the "responsibility for regulating public utilities, including . . . telephone, telegraph and information transmission companies . . . in such manner as the legislature shall provide." The relevant provisions of the NMTA require telecommunications companies to obtain certificates of public convenience and necessity from the PRC before they may offer public

telecommunications services, grant the PRC the authority to determine matters of public convenience and necessity relating to the issuance of such certificates, and permit the PRC to regulate rates for intrastate telecommunications services. See N.M. Stat. Ann. §§ 63-9A-6 and -8; Bd. of County Comm'rs of Grant County, 169 F. Supp. 2d at 1247-48. The NMTA also calls for the PRC to adopt rules that, among other things, establish consumer protection and quality of service standards, ensure adequate investment in the telecommunications infrastructure, and ensure the accessibility of interconnection by competitive local exchange carriers. See N.M. Stat. Ann. § 63-9A-8.2(B); N.M. Admin. Code tit. 17, ch. 11 (2001).

The City maintains that its telecommunications ordinance is not affected by these provisions of state law because it is a chartered home-rule municipality under Article X, Section 6 of the New Mexico Constitution and the State's Municipal Charter Act, N.M. Stat. Ann. §§ 3-15-1 to -16 (Michie 1978). The City further asserts that it owns its municipal real property in fee simple absolute, see id. § 3-20-11; Act of Apr. 9, 1900, 56 Cong. Ch. 182, 31 Stat. 72, and retains the authority under state law to "enter into contracts or leases," N.M. Stat. Ann. § 3-18-1(B) (Michie 1978), "acquire and hold property, both real and personal," id. § 3-18-1(C), grant franchises to any person, firm, or corporation for the construction and operation of any public utility, see id. §§ 3-42-1(A), § 62-1-3, regulate the use of its streets, sidewalks, curbs, gutters, and public grounds, see id. § 3-49-1, and sell or lease municipal utility facilities or real property, see id. § 3-54-1. The City also claims that the Anti-Donation Clause in Article IX, Section 14 of the New Mexico Constitution prohibits it from donating its public rights-of-way to Qwest.

With exceptions not relevant here, Article X, Section 6(D) of the New Mexico Constitution provides that a municipality which adopts a charter may '"exercise all legislative powers and perform all functions not expressly denied by general law or charter.'" This provision means that "a home rule municipality no longer has to look to the legislature for a grant of power to act, but only looks to legislative enactments to see if any express limitations have been placed on their power to act." Apodaca v. Wilson, 86 N.M. 516, 521, 525 P.2d 876, 881 (1974). In determining whether the legislature has placed an express limitation on a home-rule municipality's power to act, courts must be mindful that "[t]he purpose of this section is to provide for maximum local self-government" and that "[a] liberal construction shall be given to the powers of municipalities." N.M. Const. art. X, § 6(E); see State ex rel. Haynes v. Bonem, 114 N.M. 627, 631, 845 P.2d 150, 154 (1992).

To determine whether a state law preempts a home-rule municipality's ordinance in New Mexico, the first question that must be answered is whether the state law at issue is a general law. A '"general law' [is] a law that applies generally throughout the state *and* is of statewide concern as contrasted to 'local' or 'municipal' law.'" Bonem, 114 N.M. at 632, 845 P.2d at 154 (quoting Apodaca, 86 N.M. at 521, 525 P.2d at 881). In the context of public utility regulation, the New Mexico Supreme Court has reasoned that "ratemaking is a matter of statewide rather than local concern" because "a proposed service rate for one municipality can affect rates to other municipalities in the state" and "because ratemaking inevitably affects the financial health of a public utility." City of Albuquerque v. N.M. Pub. Serv. Comm'n, 115 N.M. 521, 530, 854 P.2d 348, 357 (1993); cf. In re Generic Investigation

Into Cable Television Servs., 103 N.M. 345, 351, 707 P.2d 1155, 1161 (1985) (concluding that "data transmission services are clearly a matter of general statewide concern"). It follows that the NMTA, which regulates telecommunications rates, terms, and conditions of service at the statewide level, is a "general law" within the meaning of Article X, Section 6(D) of the New Mexico Constitution.

The second question that must be answered to determine whether a state law preempts a home-rule municipality's ordinance is whether the state law at issue expressly denies the power of home-rule municipalities to regulate in that area. See Bonem, 114 N.M. at 634, 845 P.2d at 157. A state law need not use the exact words, "'expressly denie[d],'" in order to preempt a home-rule municipality's ordinance. "[W]ords or expressions which are tantamount or equivalent to such a negation are equally effective." Id. For example, the New Mexico Supreme Court has reasoned that a former provision of the State's constitution which granted to the State Corporation Commission (SCC) the power "of fixing, determining, supervising, regulating and controlling all charges and rates of . . . telephone . . . and transmission companies," N.M. Const. art. XI, § 7 (repealed 1999), made the exercise of such power "by any other governmental body so inconsistent with the Constitution that it is equivalent to an express denial." In re Generic Investigation Into Cable Television Servs., 103 N.M. at 351, 707 P.2d at 1161.

It does not necessarily follow from this reasoning, however, that the current version of the NMTA and Article XI, Section 2 of the New Mexico Constitution have a preemptive effect on all ordinances by home-rule municipalities that affect telecommunications services

in some way. Issues regarding the NMTA were not properly before the New Mexico Supreme Court in <u>In re Generic Investigation into Cable Television Servs.</u>, 103 N.M. at 350, 707 P.2d at 1160. Rather, the issue in that case was whether the SCC had the authority under the New Mexico Constitution or New Mexico statutes in effect at that time to regulate intrastate digital data transmission services provided to consumers by cable companies on a contract basis for compensation. <u>See id.</u> at 347, 707 P.2d at 1157. In deciding that the SCC had such regulatory authority, the New Mexico Supreme Court rejected the cable companies' argument that the SCC was precluded from regulating cable data transmissions in cities which have home-rule status and which already regulate such transmissions at the local level. <u>See id.</u> at 350-51, 707 P.2d at 1160-61. Neither the exact scope of the PRC's regulatory authority under current state law nor the extent to which that authority may lawfully coexist with a home-rule municipality's management of public rights-of-way were decided in that case.

In a subsequent opinion, the New Mexico Supreme Court was careful to distinguish ratemaking, which it characterized as a matter of statewide concern, from agreements between a municipality and a public utility regarding the utility's use of the municipality's streets and rights of way, which it characterized as "a matter of strictly local concern to the [c]ity and its inhabitants, including the provider." <u>City of Albuquerque</u>, 115 N.M. at 532, 854 P.2d at 359. Although <u>City of Albuquerque</u> involved a proceeding under the New Mexico Public Utility Act (NMPUA) rather than the NMTA, the state court's analysis relied on many of the same provisions of New Mexico's Municipal Code on which the City of

Santa Fe relies in this case, as well as the canon of statutory construction under which these provisions of the Municipal Code must be interpreted *in pari materia* with the NMPUA.  See id. at 529, 854 P.2d at 356 (citing N.M. Stat. Ann. §§ 3-18-1(B), 3-49-1(A), 3-18-17(B), 3-42-1(A)).

The New Mexico Supreme Court further explained that "the power to contract is distinct from and independent of the power to regulate," id. at 528, 854 P.2d at 355, and that a "franchise granted by a municipality to a public utility merely entitles the utility to use the municipality's streets and rights of way to construct and operate its facilities and distribution system. . . ."  Id. at 533, 854 P.2d at 360.  "In exchange for granting a franchise, a municipality may exact consideration from the utility, usually in the form of a franchise fee."  Id.  "This may equal some percentage of the utility's gross revenues or net earnings, or it may equal some other proportion of the utility's income derived from providing service in the municipality."  Id.

Federal courts addressing similar issues also have recognized a distinction between the power to regulate rates, terms, and conditions of services provided to consumers which, in most instances, falls within the authority of a statewide commission, and the power to contract for purposes of managing and requiring compensation for use of rights-of-way, which generally may fall under the authority of a local government.  See, e.g., Bd. of County Comm'rs of Grant County, 169 F. Supp. 2d at 1247-48; City of Auburn, 260 F.3d at 1178-79.  In other respects, however, the present case is distinguishable from those federal cases because they applied state laws that were more restrictive than New Mexico's, see, e.g., City

of Auburn, 260 F.3d at 1174 (concluding that a Washington statute completely exempted "companies asserting a state-wide grant from any requirement to obtain a municipal franchise for wireline facilities"), or because the local government at issue did not have the broad powers of a home-rule municipality, see, e.g., Bd. of County Comm'rs of Grant County, 169 F. Supp. 2d at 1247 (concluding that a New Mexico county possesses "only such powers as are expressly granted to it by the legislature, together with those necessarily implied to implement its express powers").

For these reasons, the analysis of whether the City of Santa Fe's telecommunications ordinance is preempted by federal law must begin from the premise that, as a home-rule municipality, the City of Santa Fe retains the authority under New Mexico law to contract with telecommunications companies for purposes of managing public rights-of-way and requiring fair and reasonable compensation as consideration for the companies' use of such rights-of-way. Reading the NMTA and Article XI, Section 2 *in pari materia* with New Mexico's Municipal Code and the provisions of state law regarding home-rule municipalities, the Court also concludes that the provisions of the City of Santa Fe's telecommunications ordinance at issue here are not preempted by state law inasmuch as they do not purport to usurp the PRC's power to issue certificates of public convenience and necessity to providers of public telecommunications services or to regulate rates and quality of service for intrastate telecommunications services. See City of Albuquerque, 115 N.M. at 532, 854 P.2d at 359; cf. Bd. of County Comm'rs of Grant County, 169 F. Supp. 2d at 1248 ("[T]he legislature's delegation of regulatory authority to the NMPRC does not . . .

restrict a local government entity from instituting reasonable requirements necessary for the maintenance and management of the public rights of way.").

### 2. Prohibitory Effects Under Section 253(a)

The fact that a provider of telecommunications services can be denied the opportunity to install or maintain its facilities in public rights-of-way if it fails to register, enter into a lease, and pay a fee to the owner of those rights-of-way does not necessarily mean that all registration and leasing requirements *per se* have a prohibitory effect that is preempted by Section 253(a) of the federal telecommunications statute. See TCG Detroit, 206 F.3d at 624; City of Portland, 200 F. Supp. 2d at 1256. Thus, Qwest has not shown that the requirements of registering under Section 27-2.1 of the City's ordinance and obtaining a lease under Section 27-3.2 of the ordinance in and of themselves have a prohibitory effect that is preempted by Section 253(a) of the federal statute as a matter of law.

Qwest also has not met its burden of showing that the type of cost-based registration and application fees contemplated in Sections 27-2.4 and 27-5.2 of the ordinance have a prohibitory effect under Section 253 at this point. According to the undisputed facts in this case, the City has not yet established the exact amount of the fee (Aff. of Yolanda Y. Vigil), and thus any challenge to the exact amount of the fee as applied to Qwest is not yet ripe for adjudication. See generally City of Auburn, 260 F.3d at 1171-72. Further, the ordinance specifies that the registration and application fees are to be "cost-based." Sections 27-2.4, 27-5.2. Thus, they are distinguishable from the "non-cost-based" application fees that were

found to be objectionable in <u>City of Auburn</u>, 260 F.3d at 1179 n. 19.  <u>See</u> <u>City of Portland</u>, 200 F. Supp. 2d at 1257.

Qwest also challenges the informational requirements of the registration and lease application process contained in Sections 27-2.3(A), 27-2.3(C), 27-3.3(A), 27-3.3(B), 27-3.3(C), 27-3.3(D)(2), 27-3.3(D)(12), 27-3.3(D)(13), and 27-3.3(D)(14) of the ordinance. Section 27-2.3(A) requires registrants to provide "the identity and legal status of the registrant, including any affiliates[, and t]he name, address and telephone number of the officer, agent or employee responsible for the accuracy of the registration statement." Section 27-2.3(C) requires "a description of the telecommunications service that the [registrant] is currently offering or providing, if any, within the city."  Section 27-3.3(A) requires "the identity of the lease applicant, including all affiliates of the applicant."  Section 27-3.3 requires, in relevant part:

> A.     the identity of the lease applicant, including all affiliates of the applicant.
>
> B.     a description of the telecommunications services that are, or will be, provided, by lessee over its telecommunications facilities.
>
> C.     a description of the transmission medium that will be used by the lessee to offer, or provide, such telecommunications services.
>
> D.     preliminary engineering plans, specifications and a network map of the telecommunications system to be located within the city.  The preliminary plans shall be made in sufficient detail to identify:
>
> . . . .
>
> (2)     the location(s), if any, for interconnection with the telecommunications facilities of other telecommunications carriers.

. . . .

(12)   a description of the services or facilities that the applicant will offer or make available to the city and other public, educational and governmental institutions.

(13)   a description of the applicant's access and line extension policies.

(14)   the area or areas of the city the applicant desires to serve and a schedule for build-out to the entire lease area.

While some of the information required in these sections may be of questionable relevance to the task of managing and requiring compensation for the use of the City's rights-of-way, see City of Auburn, 260 F.3d at 1178; TCG New York, Inc., 125 F. Supp. 2d at 91, Qwest has been operating under a franchise agreement since 1975 that also contains informational requirements which are not limited to right-of-way issues, see City of Santa Fe Ordinance No. 1975-8, § 12 (1975) (requiring the company to provide the City with notice of applications and hearings before the SCC regarding rate changes and "to provide the City with all available engineering, statistical, billing and other data pertinent to such application[s] as requested by the City").   The fact that Qwest has been operating under similar informational requirements for many years is sufficient to rebut the company's claim that these requirements have a prohibitory effect under Section 253(a).  See City of Portland, 200 F. Supp. 2d at 1256 (reasoning that no prohibitory effect under Section 253(a) was shown where, among other things, "Qwest has managed to provide telecommunications services in the Cities for many years while laboring under the allegedly prohibitive right-of-way fees and other requirements").   Further, the fact that some of the informational

requirements in the City's ordinance may not relate directly to management of the City's rights-of-way does not necessarily mean that they have a prohibitory effect within the meaning of Section 253(a).  See id. at 1255-56 (distinguishing the preemptive language of Section 253(a) from the "safe-harbor provisions" of Section 253(c)).

There are, however, several provisions of the City of Santa Fe's telecommunications ordinance which are preempted by Section 253(a) of the federal statute because they leave City officials with "essentially unfettered discretion" to prohibit any entity from providing telecommunications services in Santa Fe.  RT Communications, Inc., 201 F.3d at 1269. Ordinances that allow local officials to condition their approval on vague and broad factors such as "the public interest" consistently have been found to involve such unfettered discretion and to fall within the preemptive scope of Section 253(a) on that basis.  See, e.g., City of Auburn, 260 F.3d at 1176,1179; TCG New York, Inc., 125 F. Supp. 2d at 88-89, 93.

Sections 27-3.4, 27-2.3(E), and 27.3.3(D)(16) of the City of Santa Fe's ordinance fall into this category.  Section 27-3.4 provides, in relevant part, that:  "Leases shall be entered into only when the governing body finds, by way of ordinance, that the lease agreement is in the best interest of the public and states the grounds for permitting the location of the facilities upon city land or facilities."  In addition, Section 27-2.3(E) states that the registration information to be provided to the City shall contain "such other information as the city may reasonably require."  Section 27-3.3(D)(16) states that a lease application shall include preliminary plans in sufficient detail to identify "such other and further information as may be required by the city."  All of these vague and open-ended requirements of the

ordinance have a prohibitory effect under Section 253 of the federal telecommunications statute. By implication, any prohibitory effects in the lease-application requirements of the ordinance also extend to the lease-renewal requirements in Section 27-3.5.

The remaining provisions of the City's ordinance which Qwest challenges relate to the fee structure associated with leasing City property under the ordinance. The Court addresses these requirements together because their cumulative effect is prohibitory within the meaning of Section 253(a).

Section 27-3.3(D)(15) of the ordinance requires lease applicants to provide the City with "an appraisal from an appraiser on the city's list of pre-approved appraisers, indicating the annual fair market rental value of the real property to be leased." Section 27-5.3 further provides, in relevant part, that by way of the appraisal required under Section 27-3.3(D)(15), the City "shall fix a fair and reasonable rental to be paid for the lease rights granted to a telecommunications lessee for the term of the lease." In addition to this rental fee, Section 27-3.7(F) specifies, in relevant part, that "anyone owning or laying conduit within the city's property, shall dedicate the conduit to the city upon attaining a lease or performing construction and laying conduit upon city property," and that "[a]ll conduit so installed shall include an excess capacity equal to at least 100% of the capacity utilized by the party installing the conduit." Section 27-3.7(G) further provides that "[a]ny person co-locating linear facilities in conduit on city property shall pay [its] just and reasonable portion of costs expended by any person who owns or has dedicated the conduit."

In support of its motion for summary judgment, Qwest has submitted a declaration detailing the costs of obtaining a lease for installation of a new fiber cabinet and concrete pad on Bishop's Lodge Road in late 1999 or early 2000. (Mem. in Supp. of Mot. for Summ. J. at 7-8; Decl. of Daniel T. Sanchez.) The City does not dispute the account of the leasing of the Bishop's Lodge Road property set forth by Qwest, but notes that Qwest has refused to apply for any additional leases and that the City's revenue from the 1975 franchise agreement for the fiscal year 1999-2000 was $576,166. By comparison, if the $6,000 rental fee for the Bishop's Lodge Road property is multiplied by the 365 large cabinets of comparable size that Qwest has installed in the City of Santa Fe, the City would be collecting $2,190,000 annually in rental fees for these large cabinets alone. In addition, Qwest could be incurring a 30% to 59% increase in costs for installation of excess-capacity conduit. Under the ordinance, the City could be collecting rent from Qwest and other telecommunications owners not only for the use of this excess-capacity conduit, but for the use of all conduit previously installed by Qwest which must be dedicated to the City under the terms of the ordinance.

Based on the uncontested evidence submitted in support of Qwest's motion, it is reasonable to infer a massive increase in the company's cost of doing business in Santa Fe as a result of the cumulative effect of the rental fees, appraisal, dedication, and excess-capacity requirements of Sections 27-3.3(D)(16), 27-5.2, and 27-3.7(G) and (H) of the City's ordinance. The only reasonable inference from the undisputed factual record in this case is

that such a massive increase would have a prohibitory effect on any entity's ability to provide telecommunications services within the meaning of Section 253(a).

### 3. Relationship to Rights-of-Way Under Section 253(c)

Only those provisions of the ordinance which are prohibitory under Section 253(a) require further analysis under Section 253(c). See Town of Palm Beach, 252 F.3d at 1191-92; City of Berkeley III, 208 F.R.D. at 293; City of Portland, 200 F. Supp. 2d at 1255-56. Accordingly, the Court limits its application of Section 253(c) of the federal statute in this case to those provisions of the City's ordinance which it finds to be prohibitory in their cumulative effect, namely Sections 27-2.3(E), 27-3.3(D)(15), 27-3.3(D)(16), 27-3.4, 27-3.5, 27-3.7(F), 27-3.7(G), and 27-5.3.

The language in Section 253(c) of the federal telecommunications statute has been construed to contain both a savings clause and a negative restriction on the ability of local governments to manage and require compensation for use of public rights-of-way. As a savings clause, Section 253(c) saves from preemption any local regulations that have a prohibitory effect under Section 253(a) but which fall within the local government's authority "to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, . . . if the compensation required is publicly disclosed by such government." 47 U.S.C. § 253(c). As a negative restriction on the ability of local governments to regulate in this area, Section 253(c) requires that such compensation be "fair and reasonable" as well as "competitively neutral and nondiscriminatory." Id. Accordingly, the Court's analysis of

Section 253(c) encompasses both the City's arguments that its telecommunications ordinance is saved from preemption by Section 253(c) as well as Qwest's contention that the ordinance runs afoul of the fairness, reasonableness, and competitive neutrality requirements of that section.

Sections 27-2.3(E), 27-3.3(D)(16), and 27-3.4 of the ordinance contain language that is too broad to fit within the City's authority to manage and require compensation for the use of public rights-of-way. The ordinance requires registrants to provide "such other information as the city may reasonably require," Section 27-2.3(E), and requires lease applicants to provide "such other and further information as may be required by the city," Section 27-3.3(D)(16). Section 27-3.4 of the ordinance further provides that lease approval must be conditioned on a finding that "the lease agreement is in the best interest of the public." Requirements that rely on such vague and broad language are not limited to right-of-way management or compensation issues. See TCG New York, Inc., 125 F. Supp. 2d at 91-93. By implication, such defects in the lease-application requirements of the ordinance also extend to the lease-renewal requirements in Section 27-3.5. Accordingly, Sections 27-2.3(E), 27-3.3(D)(16), 27-3.4, and 27-3.5 of the ordinance are not saved from preemption by Section 253(c) of the federal statute.

The ordinance also contains several provisions which bear an obvious relationship to management and compensation for the use of the City's rights-of-way but nevertheless fail to satisfy the requirements of fairness, reasonableness, nondiscrimination, and competitive neutrality. These provisions consist of the appraisal requirements in Section 27-3.3(D)(15)

of the ordinance, the rental fee requirements in Section 27-5.3, and the requirements relating to construction and dedication of excess-capacity conduit in Sections 27-3.7(F) and 27-3.7(G).

The appraisal and rental fee requirements relate to management and compensation for the use of the City's rights-of-way because they are based on the actual amount of right-of-way used by a telecommunications company. The requirements for construction and dedication of conduit directly relate to management and compensation for the use of rights-of-way because they reduce the frequency with which the rights-of-way need to be excavated for purposes of installing conduit. Cf. Cablevision of Boston, Inc., 38 F. Supp. 2d at 60 ("Constructing new conduit requires digging up the City's streets and attendant disruption. Putting new cable in existing conduit or converting existing cable to new uses does not require digging up streets or disruption."). The latter conclusion finds support in an affidavit submitted by the City in this case, which states that: "The logic behind installing more than the needed capacity is that the marginal cost of installing . . . additional [conduit] is far outweighed by the benefits to the city of avoiding or minimizing future disruption to traffic and businesses and increasing the longevity of the road." (Aff. of Leroy N. Pacheco.)

Dedication and installation of excess-capacity conduit, as well as other facilities that a lease applicant may offer or make available to the City, also may relate to the compensation the City receives for the use of its rights-of-way insofar as Section 27-5.5 of the ordinance leaves open the possibility that such compensation may take the form of "cash or equivalent facilities, or equivalent telecommunications services." Cf. TCG New York, Inc., 125 F.

Supp. 2d at 95-98 (concluding that a fee structure which incorporated "in kind" compensation in the form of installing conduit for municipal purposes was neither unfair nor unreasonable under Section 253(c)).  For these reasons, the Court concludes that the appraisal requirements in Section 27-3.3(D)(15), the requirements for dedication and installation of excess capacity conduit in Sections 27-3.7(F) and (G), and the rental fee set forth in Section 27-5.3 of the ordinance relate to management and compensation for use of the City's rights-of-way.

It does not necessarily follow, however, that these provisions of the ordinance are saved from preemption by Section 253(c) of the federal statute.  Qwest also objects to these requirements on the grounds that they do not meet the specific requirements of fairness, reasonableness, or competitive neutrality in Section 253(c).

The central argument behind Qwest's objection is that the phrase "fair and reasonable compensation" in Section 253(c) means that local governments can charge no more than the actual costs they incur by allowing telecommunications companies such as Qwest to use public rights-of-way.  It is undisputed that the compensation required under the City's ordinance is not limited to recovery of such costs because the ordinance is also designed to obtain compensation for the fair market rental value of the City property leased by telecommunications owners.

Courts are split as to what types of fees may be considered "fair and reasonable" under Section 253(c).  Some have adopted the cost-recovery model that Qwest advocates, see, e.g., Bell Atlantic-Maryland, Inc. v. Prince George's County, Md., 49 F. Supp. 2d 805,

817 (D. Md. 1999), <u>vacated</u>, 212 F. 3d 863 (4th Cir. 2000), while others have applied a totality-of-the-circumstances test that encompasses a broader set of factors, <u>see, e.g.</u>, <u>TCG Detroit v. City of Dearborn</u>, 16 F. Supp. 2d 785, 790 (E.D. Mich. 1998), <u>aff'd</u>, 206 F.3d 618 (6th Cir. 2000).

The cost-recovery model begins from the premise that in order to qualify as "fair and reasonable compensation" under Section 253(c), the fees charged by a local government must be directly related to actual use of the public rights-of-way by the entity paying the fee. <u>See, e.g.</u>, <u>City of Berkeley I</u>, 146 F. Supp. 2d at 1100. Based on this premise, some courts have reasoned that fees based on a percentage of a telecommunications company's revenue are not "fair and reasonable" under Section 253(c), inasmuch as the company's revenue cannot be directly tied to its actual use of local rights-of-way. <u>See, e.g.</u>, <u>Bd. of County Comm'rs of Grant County</u>, 169 F. Supp. 2d at 1251 (citing an unpublished slip opinion in the same case). Some courts have taken this premise a step further and concluded that the only type of compensation which directly relates to actual use of local public rights-of-way is one that is limited to recovering "the costs of administering the[] franchise programs and of maintaining and improving the[] public rights-of-way. Franchise fees thus may not serve as general revenue-raising measures." <u>Bell Atlantic-Maryland, Inc.</u>, 49 F. Supp. 2d at 817.

The Court accepts the basic premise from this line of authorities that in order to fall within the savings clause of Section 253(c), the compensation required by a local government must directly relate to actual use of local rights-of-way. It does not necessarily follow, however, that cost-recovery is the only type of compensation that directly relates to actual

use of local rights-of-way. If Congress had intended to limit local governments to charging cost-based fees for the use of public rights-of-way, Section 253(c) of the federal statute would have used the word "costs" instead of the word "compensation." See <u>TCG Detroit</u>, 206 F.3d at 624-25.

Application of the cost-recovery model is also inappropriate in this case to the extent that the application of that model in other cases was influenced by matters of state or local law which are distinguishable. See, e.g., <u>AT&T Communications of the Southwest, Inc. v. City of Dallas</u>, 8 F. Supp. 2d 582, 593 (N.D. Tex. 1998) (noting that "Texas law is clear that a telecommunications provider has a statutory right to use public rights-of-way for long distance services without any franchise from municipalities"); <u>City of Berkeley I</u>, 146 F. Supp. 2d at 1100 (finding it unnecessary to addressed municipality's proposed rental fees because "common carriers would be exempt from these charges"); <u>City of Portland</u>, 200 F. Supp. at 1255 (noting that <u>City of Auburn</u>, 260 F.3d at 1179 n.19, found non-cost-based application fees objectionable but had no reason to address revenue-based gross receipts tax because "Qwest expressly conceded the tax's validity"). As noted above, New Mexico law does not impose as many limits on the authority of home-rule municipalities as the laws of some other states, and the application fees and registration fees contemplated by the City of Santa Fe's ordinance are cost-based. These factors serve to distinguish the ordinance at issue in this case from those which have been found to be preempted by Section 253 under the cost-recovery model.

For these reasons, the totality-of-the-circumstances test adopted by the Sixth Circuit in <u>TCG Detroit</u>, 206 F.3d at 624-25, and followed by several district courts, <u>see, e.g.</u>, <u>TCG New York, Inc.</u>, 125 F. Supp. 2d at 96; <u>City of Portland</u>, 200 F. Supp. 2d at 1258, provides a more sound and thorough methodology for determining whether the City of Santa Fe's fee structure is saved from preemption by Section 253(c). The Sixth Circuit's analysis largely follows that of the district court opinion it was affirming, which further concluded that "there is nothing inappropriate with the city charging compensation, or 'rent', for the City owned property that the Plaintiff seeks to appropriate for its private use." <u>TCG Detroit</u>, 16 F. Supp. 2d at 789.

According to the "totality of the circumstances" test, the factors to be considered in determining whether compensation is fair and reasonable under Section 253(c) include "the amount of use contemplated," "the amount that others would be willing to pay," and "the fact that [the telecommunications provider] had agreed in earlier negotiations to a fee almost identical to what it was now challenging as unfair." <u>TCG Detroit</u>, 206 F.3d at 625. The telecommunications providers' "contention that the fees in the agreement that the City wishes to impose are so excessive that it is likely to render doing business unprofitable" also may be considered. <u>TCG Detroit</u>, 16 F. Supp. 2d at 791. Under this type of analysis, it is possible for a revenue-based fee to be fair, reasonable, and non-prohibitory, inasmuch as there is evidence that other telecommunications providers would be willing to pay such a fee and the parties have agreed to such a fee in their previous dealings. <u>See</u> <u>id.</u> at 790-91.

The "totality-of-the-circumstances" test also has the benefit of harmonizing Section 253 with recent Supreme Court jurisprudence concerning the Tenth Amendment to the United States Constitution and the limits of congressional power under the Commerce Clause. See Printz, 521 U.S. at 935; New York v. United States, 505 U.S. 144, 175-77 (1992).

> When faced with a statutory interpretation that "would raise serious constitutional problems, the [c]ourt[s] will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." We follow this approach because we assume that Congress legislates with constitutional limitations in mind and will speak clearly when it seeks to test those limitations.

U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988)) (citation omitted); accord Hoang v. Comfort, 282 F.3d 1247, 1260-61 (10th Cir. 2002).[1]

In their interpretation of Section 253(c) of the Telecommunications Act of 1996, courts have been careful to note that this section "'imposes—at most—a *negative* restriction on local authorities' choices regarding the management of their rights of way.'" RT Communications, 201 F.3d at 1269 (quoting Cablevision of Boston, Inc., 184 F.3d at 105)

---

[1]The City objects to the cost-recovery model on a number of related grounds, such as the Anti-Donation Clause in the New Mexico Constitution, N.M. Const. art. IX, § 14, and the Unfunded Mandates Reform Act of 1995, 2 U.S.C. § 1501-1571 (2000). In addition, some commentators have raised the issue of whether Section 253 causes a physical appropriation of property owned by local governments in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. See, e.g., Jeffrey L. Worstell, Note, Section 253 of the Telecommunications Act of 1996: A Permanent Physical Appropriation of Private Property that Must be Justly Compensated, 50 Fed. Comm. L.J. 441 (1998). But cf. City & County of Denver v. Qwest Corp., 18 P.3d 748, 761 (Colo. 2000) (recognizing that "a state can take public rights-of-way without compensating the municipality within which they are located"). The Court finds it unnecessary to address these related issues because the Tenth Amendment and Commerce Clause limitations are more relevant and clearly defined in this context.

(emphasis added).  One of the reasons for this interpretation is that reading Section 253(c) as an affirmative obligation on state or local governments "would raise significant constitutional issues regarding Congress's ability to commandeer local regulatory bodies for federal purposes."  Id. (citing Printz, 521 U.S. at 934).  A forced transfer of property that is in principle no different from "a congressionally compelled subsidy from state governments" could constitute such an unconstitutional commandeering of state or local governments.  New York, 505 U.S. at 175.

There is a danger that Section 253(c) could amount to such a congressionally compelled subsidy if it is construed as imposing a cost-recovery model of compensation that in effect forces cities like Santa Fe to permit rent-free use of municipal property by private telecommunications companies.  There is also a danger that the federal statute would have the effect of commandeering state or local government's authority to legislate in this area if it is construed to require affirmative injunctive relief that would force the City to issue franchises, leases, or permits, or to remit fees to Qwest in order to implement the cost-recovery model.  The "totality of the circumstances" test avoids such serious constitutional problems and is, therefore, the more favored construction of the statute.

Although the Court rejects the cost-recovery model advocated by Qwest in favor of the "totality of the circumstances" test, it does not necessarily follow that the fee structure contemplated in the City of Santa Fe's ordinance passes this test.  While the fee charged to a particular telecommunications provider under the ordinance depends on how much of the City's leasable property the provider actually uses, it is undisputed that under the ordinance

the City intends to charge an annual rental fee of $6,000 for a four-by-four foot cabinet sitting on a twelve-by-eighteen foot concrete pad, and that Qwest has approximately 365 large cabinets in the City of Santa Fe, plus a number of smaller facilities. When multiplied by the number of similar Qwest facilities in the City and compared to the $576,166 in revenue that the City received in fiscal year 1999-2000 under its 1975 franchise agreement with Qwest, this annual rental fee results in a large increase that is unprecedented in the parties' prior dealings. Further, the appraisal supporting the $6,000 annual rental fee for the Bishop's Lodge Road facility is not in the record, and the City has presented no evidence that other similarly-situated telecommunications providers are willing to pay comparable rental fees.

Even assuming that the appraisal required under Section 27-3.3(D)(15) of the ordinance fairly and reasonably calculates "the fair market rental value of the real property to be leased," there is no indication in the ordinance that such an appraisal would necessarily take into account factors such as the non-exclusive nature of a telecommunications provider's lease rights and the value of the "in kind" contribution that a provider would be making by dedicating all of its existing conduit to the City and building excess-capacity conduit which could be leased by the City to other providers. Section 27-5.3 of the ordinance states that the "fair and reasonable rental to be paid for the lease rights granted to a telecommunications lessee" are to be fixed "by way of the appraisal referred to in subsection 27-3.3(D)(15)." Section 27-5.3 does not indicate that any other information besides the appraisal is to be considered in fixing the rental fee. Further, the provision for "in kind" contributions in

Section 27-5.5 does not indicate that the dedication of existing conduit or installation of excess capacity conduit under Sections 27-3.7(F) are to be considered "in kind" contributions in calculating the rental fee under Section 27-5.3.

Instead, the only way for telecommunications providers to recover the cost of installing excess-capacity conduit under the ordinance is by means of Section 27-3.7(G), which provides, in relevant part, that: "Any person co-locating linear facilities in conduit on city property shall pay [its] just and reasonable portion of costs expended by any person who owns or has dedicated the conduit." As Qwest points out, the problem with this approach is that Section 27-3.7(F) of the ordinance requires telecommunications providers to install excess capacity conduit in all cases, but Section 27-3.7(G) only allows such providers to recover the cost of installing such excess capacity conduit in those cases where the excess-capacity conduit is actually used by another person. Qwest is correct that this scheme violates Section 253(c)'s requirements of fairness, reasonableness, nondiscrimination, and competitive neutrality because it forces earlier entrants into the telecommunications market to dedicate all their existing conduit to the City and bear the risk of installing excess capacity conduit for which they never will be compensated, while allowing later entrants to simply use the conduit previously installed and dedicated by others without making any dedication of their own or bearing such a risk.

The City's ordinance does not take the more nondiscriminatory and competitively neutral approach of treating the dedication of existing conduit and the cost of installing the excess capacity conduit as an "in kind" contribution that is credited toward the rental fee

charged under Section 27-5.3 of the ordinance.  Without such credits, there is little to offset the large fee increases that follow from the City's decision to rely solely on an appraised fair market value as the basis for its rental fees.

### 4.  Cumulative Effect and Severability

Based on the above analysis, Sections 27-2.1, 27-2.3(A), 27-2.3(C), 27-2.4, 27-3.2, 27-3.3(A), (B), (C), (D)(2), and (D)(12) through (D)(14), and 27-5.2 of the City of Santa Fe's 1998 telecommunications ordinance are not preempted by Section 253 of the federal statute because they are not prohibitory within the meaning of Section 253(a) of that statute.  This conclusion does not depend on whether these provisions of the ordinance relate to management or compensation for the use of the City's rights of way under Section 253(c) because the City is not required to show that the provisions of its ordinance fall under the savings clause in Section 253(c) unless Qwest first shows that they have a prohibitory effect under Section 253(a).  See Town of Palm Beach, 252 F.3d at 1191-92; City of Berkeley III, 208 F.R.D. at 293; City of Portland, 200 F. Supp. 2d at 1255-56.

The Court reaches a different conclusion regarding Sections 27-2.3(E), 27-3.3(D)(15), 27-3.3(D)(16), 27-3.4, 27-3.5, 27-3.7(F), 27-3.7(G), and 27-5.3 of the City's ordinance.  Qwest has met its burden of showing that these provisions of the ordinance are prohibitory at least in their cumulative effect if not individually.  Of these provisions, Sections 27-2.3(E), 27-3.3(D)(16), 27-3.4, and (by implication) 27-3.5 are not within the limits of the City's authority to manage and require compensation for use of public rights-of-way and do not fall under the savings clause in Section 253(c) of the federal statute for that reason.  Further,

Sections 27-3.3(D)(15), 27-3.7(F), 27-3.7(G), and 27-5.3 are not saved from preemption by Section 253(c) because, when viewed as a whole, they do not meet the requirements of fairness, reasonableness, nondiscrimination, and competitive neutrality. Thus, Sections 27-2.3(E), 27-3.3(D)(15), 27-3.3(D)(16), 27-3.4, 27-3.5, 27-3.7(F), 27-3.7(G), and 27-5.3 of the City's ordinance are preempted by Section 253 of the federal statute.

The Court next considers whether the preempted portions of the ordinance can be severed from the remaining provisions. Section 27-8.1 of the City's ordinance consists of a severability clause which provides that: "The various parts, sections and clauses of this Ordinance are hereby declared to be severable. If any part, sentence, paragraph, section or clause is adjudged unconstitutional or invalid by a court of competent jurisdiction, the remainder of the Ordinance shall not be affected thereby."

Whether the preempted provisions of the ordinance are severable from the remainder of the ordinance is a matter of state law. See Leavitt v. Jane L., 518 U.S. 137, 139 (1996) (per curiam). Under New Mexico law, "[i]t is a fundamental principle that a part of a statute may be invalid and the remainder valid, where the invalid part can be separated from other portions, without impairing the force and effect of the remaining portions." Giant Indus. Ariz., Inc. v. Taxation & Revenue Dep't, 110 N.M. 442, 444, 796 P.2d 1138, 1140 (Ct. App. 1990) (citing Bradbury & Stamm Constr. Co. v. Bureau of Revenue, 70 N.M. 226, 372 P.2d 808 (1962)). A partially invalid statute must satisfy the following test before it can continue in force:

(1) the invalid part must be separable from the other portions without impairing the force and effect of the remaining parts; (2) the legislative purpose expressed in the valid portion can be given force and effect without the invalid part; and (3) when considering the entire act, it cannot be said that the legislature would not have passed the remaining part if it had known that the objectionable part was invalid.

Id. "[T]he effect of a declaration of severability in the ordinance creates a presumption that the ordinance is divisible," City of Albuquerque v. Cauwels & Davis Mgmt. Co., 96 N.M. 494, 496, 632 P.2d 729, 731 (1981), because such a declaration is presumed to show that the legislative body would "have passed the remaining part if it had known that the objectionable part was invalid," Giant Indus. Ariz., Inc., 110 N.M. at 444, 796 P.2d at 1140.

"It is beyond the power of the courts," however, "to rewrite an ordinance." Cauwels & Davis Mgmt. Co., 96 N.M. at 496, 632 P.2d at 731. Thus, the Court cannot " dissect invalid portions and reframe an ordinance from the valid portions where the remaining features will be substantially affected by the removal" or where "the valid portions are inextricably intertwined with the invalid portions of the ordinance" such that the Court "cannot separate them without substantially affecting the ordinance." Id.

In this case, the leasing requirements in Sections 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of the ordinance are inextricably intertwined and cannot function without the provisions contained therein which are preempted by Section 253 of the federal statute. On the other hand, the registration requirements in Sections 27-2.1, 27-2.2, 27-2.3, and 27-2.4 can function without Section 27-2.3(E), which is preempted by federal law. Thus, there are provisions of the ordinance

which can be severed in this instance, but the provisions which must be severed to survive federal preemption include not only the registration requirement in Section 27-2.3(E), but also the entire leasing scheme set forth in Sections 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of the ordinance.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Qwest is entitled to partial summary judgment declaring that Sections 27-2.3(E), 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of the ordinance, when viewed as a whole, are preempted by federal law and enjoining the City from enforcing these provisions of the 1998 ordinance against Qwest.  The City of Santa Fe is entitled to partial summary judgment as to the remainder of Qwest's claims, and Qwest is not entitled to an award of attorney fees or any affirmative injunctive relief that would force the City to issue leases or permits or remit fees to Qwest. Further, the relief granted by this Court is not intended to affect the parties' interim agreement during the pendency of this litigation.

**IT IS, THEREFORE, ORDERED** that Qwest's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Sections 27-2.3(E), 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of the City of Santa Fe's 1998 telecommunications ordinance are hereby declared to be preempted by Section 253 of the Telecommunications Act of 1996, 47 U.S.C. § 253.

**IT IS FURTHER ORDERED** that the City of Santa Fe, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with the City of Santa Fe who receive actual notice of this order are enjoined from taking any enforcement action against Qwest Corporation based upon Sections 27-2.3(E), 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.6, 27-3.7(F), 27-3.7(G), 27-5.2, 27-5.3, and 27-6.3(B) of the City of Santa Fe's 1998 telecommunications ordinance.

**IT IS FURTHER ORDERED** that the City of Santa Fe is granted summary judgment as to the remainder of the claims in Qwest's complaint.

**SO ORDERED** this 29th day of August, 2002, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge